# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No. 10-31694

WILLIAM EDWIN LINDSEY
dba LINDSEY & ASSOCIATES
aka BILL LINDSEY
aka WILLIAM E. LINDSEY

Debtor

## MEMORANDUM ON
## MOTIONS FOR SUMMARY JUDGMENT

**APPEARANCES:**    JENKINS & JENKINS ATTORNEYS, PLLC
Michael H. Fitzpatrick, Esq.
Suite 2121, First Tennessee Plaza
800 South Gay Street
Knoxville, Tennessee  37929
Attorneys for Debtor

HODGES, DOUGHTY & CARSON, PLLC
Thomas H. Dickenson, Esq.
Post Office Box 869
Knoxville, Tennessee  37901
Attorneys for Pinnacle National Bank and Mountain National Bank

WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
Walter N. Winchester, Esq.
Suite 1000, First Tennessee Plaza
800 South Gay Street
Knoxville, Tennessee  37929
Attorneys for FirstBank

DANIEL M. MCDERMOTT, ESQ.
UNITED STATES TRUSTEE
Patricia Foster, Esq.
Howard H. Baker, Jr. United States Courthouse
800 Market Street
Suite 114
Knoxville, Tennessee  37902
Attorneys for United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

These contested matters are before the court upon the Motion for Summary Judgment filed by Pinnacle National Bank and Mountain National Bank on June 27, 2011 (Joint Bank Motion) and the Motion by FirstBank for Summary Judgment With Supporting Memorandum of Law filed on July 12, 2011 (FirstBank Motion).[1]  Both motions seek a determination that the First Amended Plan of Reorganization (Amended Plan) filed by the Debtor on April 6, 2011, cannot be confirmed as a matter of law because it allows the Debtor to retain pre-petition property in violation of 11 U.S.C. § 1129(b)(2)(B)(ii) (2006) (the "absolute priority rule").

The Joint Bank Motion is accompanied by a brief and a Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (Joint Bank Statement of Undisputed Facts), in which Pinnacle National Bank and Mountain National Bank, pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure, applying Rule 201 of the Federal Rules of Evidence to bankruptcy cases, ask the court to take judicial notice of certain material undisputed facts of record in the Debtor's bankruptcy case.  Pursuant to E.D. Tenn. LBR 7056-1, the Debtor filed a Response to the Joint Bank Motion and a Response to the Joint Bank Statement of Undisputed Facts on July 18, 2011, in which he does not dispute any of the stated facts, together with a responsive brief in opposition to the Joint Bank Motion.

The FirstBank Motion incorporates therein a brief and is accompanied by FirstBank's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (FirstBank Statement of Undisputed Facts).   Pursuant to E.D. Tenn. LBR 7056-1, the Debtor filed a Response to the FirstBank Motion and a Response to the FirstBank Statement of Undisputed Facts on July 26,

---

[1]  The court may also refer to the two motions for summary judgment collectively as Motions for Summary Judgment.

2

2011, in which he does not dispute any of the stated facts, together with a responsive brief in opposition to the FirstBank Motion.[2]

## I

The Debtor filed the Voluntary Petition commencing his bankruptcy case under Chapter 11 on April 5, 2010, and has operated as a Debtor-in-Possession pursuant to 11 U.S.C. § 1107 (2006). FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 1.  The Amended Plan provides for twelve classes, Classes 2 through 12 of which are impaired, and is to be implemented through the sale of property as designated in the Amended Plan, through the Debtor's income, and through the commencement of required payments.  AMENDED PLAN at 10, 19; JOINT BANK STMT. OF UNDISP. FACTS at ¶¶ 1, 3; FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 5.  Specifically, the Amended Plan proposes the sale of the following:  (1) the Debtor's tenancy in common interest in real property located at Briarthicket Road in Cocke County, Tennessee; (2) his stock in Ultimate Toys Motorsports, Inc.; (3) his membership in BTRG, LLC; (4) his membership in Ultimate Toys, LLC; and (5) his membership in WL & MC Development, LLC.  AMENDED PLAN at 19; JOINT BANK STMT. OF UNDISP. FACTS at ¶ 4; FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 10.

The following property owned by the Debtor, disclosed in the Amended Disclosure Statement filed on February 21, 2011, is not proposed for sale and is to be retained by the Debtor:  (1) real property located at 826 Loop Road, Knoxville, Tennessee; (2) real property located at Lot #88 Ladd Landing, Roane County, Tennessee; (3) real property located at 708 Eagleton Road, Maryville,

---

[2] The Debtor mistakenly titled his response as "William E. Lindsey Response to the Motion for Summary Judgment of Pinnalce [sic] National Bank and Mountain National Bank" and mistakenly titled his brief as "William E. Lindsey Brief in Opposition to the Motion for Summary Judgment of Pinnalce [sic] National Bank and Mountain National Bank."

3

Tennessee; (4) real property located at 400 Henderson Street, Maryville, Tennessee; (5) real property located at 7111 Clinton Highway, Knoxville, Tennessee; (6) a lease with Mercy Partners in Cocke County, Tennessee; (7) a note in the amount of $87,000.00 with Ms. Chitwood secured by residential real property located at 723 E. Churchwell Avenue, Knoxville, Tennessee; (8) 100,000 shares of WIN stock; (9) 50% membership in Jefferson Plaza, LLC; (10) 100% interest in Eastland Capital, LLC; (11) 50% interest in Lindsey Leasing, LLC; (12) 50% interest in JS&A, LLC; (13) 30% interest in LEC Properties; (14) 30% interest in LHC Properties; (15) 33.33% interest in LECH; (16) 50% interest in L&C Properties; (17) a pistol; (18) a note with the Maupin Estate; (19) a 1995 Jeep; (20) a 1997 pick-up truck; (21) office equipment; and (22) a note in the amount of $470,961.00 with Danika Lindsey. AMENDED DISCL. STMT. at 20-35; JOINT BANK STMT. OF UNDISP. FACTS at ¶ 5; FIRSTBANK STMT. OF UNDISP. FACTS at ¶¶ 4, 11.

The Banks' claims are addressed individually in Classes 5 and 6 (Pinnacle National Bank), Class 7 (FirstBank), and Classes 8 and 9 (Mountain National Bank), and collectively as part of Class 11. The proposed treatment for each is as follows:

### Class 5. PINNACLE NATIONAL BANK SECURED CLAIM #8

Class 5 consists of the pre-petition secured claim of **Pinnacle National Bank** filed as Claim #8 in the amount of $1,203,900.00 as a secured claim in 10267 Kingston Pike, Knoxville, TN. It foreclosed its deed of Trust. It amended the claim. The $243,900.00 deficiency will be treated as an unsecured claim.

### Class 6. PINNACLE NATIONAL BANK SECURED CLAIM #9

Class 6 consists of the pre-petition secured claim of **Pinnacle National Bank** filed as Claim #9 in the amount of $953,186.45 as a secured claim in the insurance claim on the destroyed mining equipment [of Lindsey Leasing, LLC]. It shall retain its lien and contract rights in the personal property insurance claim. Any deficiency after recovery shall be an unsecured claim if determined prior to January 1, 2013.

4

Class 7.  FIRSTBANK SECURED CLAIM #13

Class 7 consists of the pre-petition secured claim of FirstBank filed as Claim #13 in the amount of $4,301,941.72 as a secured claim in the real property of the Debtor.  Suit has been filed to avoid the lien.  If the lien is avoided, then the claim will be treated as unsecured.

If the lien is not avoided and the creditor does not make the election provided in § 1111(b), then the interest of the debtor in any land subject to the lien claim will be sold by auction (unless a more specific sale is provided elsewhere in the plan) and the net after prior liens will be paid to this claim.  The deficiency after liquidation of its collateral will be paid as unsecured.

If the creditor makes the § 1111(b) election, then the lien will remain in place subject to the provisions of T.C.A. § 25-5-105 and the creditor will not be allowed an unsecured claim.[3]

Class 8.  MOUNTAIN NATIONAL BANK SECURED CLAIM #5

Class 8 consists of the pre-petition secured claim of **Mountain National Bank** filed as Claim #5 in the amount of $413,762.44 as a secured claim in the Briarthicket Road, Cocke County property owned jointly with Mr. Davis.  The Debtor will quit claim the property to Mr. Davis if there is no equity and Mr. Davis will deal directly with Mountain National Bank.  If there is equity, the Debtor will sell Mr. Davis his interest.  Mountain National Bank shall retain its lien until paid in full.  There will be no unsecured claim.

Class 9.  MOUNTAIN NATIONAL BANK SECURED CLAIM #9 [sic]

Class 9 consists of the pre-petition secured claim of **Mountain National Bank** filed as Claim #6 in the amount of $809,802.86 as a secured claim in the real property of Samuel Spivey in Greene County, TN.  The claim will be treated as a general unsecured claim if there is a default and a deficiency if determined prior to January 1, 2013.

. . . .

---

[3] Pursuant to an Agreed Judgment entered on March 16, 2011, in *Lindsey v. FirstBank,* Adv. Proc. No. 10-3112, FirstBank's entire claim is unsecured and will be paid as a Class 11 claim.  FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 3.

Class 11. <u>GENERAL UNSECURED CLAIMS</u>:

Class 11 consists of the pre-petition **General Unsecured Claims** scheduled by the Debtor in Schedule F, unless listed as *disputed*, *contingent or unliquidated*, or filed by the creditor prior to the claims bar date in this case (unless not listed by the Debtor or the creditor did not receive notice in sufficient time to file a claim by the bar date), to the extent allowed by the Court if the Debtor objected thereto and any deficiency claim of an under-secured creditor having a lien on property of the estate who does not make the election provided in 11 U.S.C. § 1111(b).  This class will be paid not less than $1,275,000.00 over the life of the plan.  This class will <u>***NOT***</u> be paid in full.

AMENDED PLAN at 13-15, 19; JOINT BANK STMT. OF UNDISP. FACTS at ¶ 2; FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 6. The Debtor's interest is dealt with under Class 12 of the Amended Plan, which provides that upon confirmation, "[a]ll property of the estate will vest" in him.  AMENDED PLAN at 15; JOINT BANK STMT. OF UNDISP. FACTS at ¶ 5; FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 12.  As reflected by the Ballot Summary filed on April 13, 2011, Pinnacle National Bank, Mountain National Bank, and FirstBank have all rejected the Amended Plan.  BALLOT SUMM.; JOINT BANK STMT. OF UNDISP. FACTS at ¶ 2; FIRSTBANK STMT. OF UNDISP. FACTS at ¶ 9.[4]

## II

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" with the procedures concerning summary judgment requiring the following:

(1) ***Supporting Factual Positions***.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

---

[4]  The FirstBank Statement of Undisputed Facts, consisting of paragraphs 1 through 7, and 9 through 12, contains a numbering error in that paragraph 8 is omitted.  To avoid confusion, the court has utilized the numbered paragraphs as reflected in the document.

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence*.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited*.  The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations*.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56(c) (applicable in contested matters by virtue of Rules 9014 and 7056 of the

Federal Rules of Bankruptcy Procedure).

When deciding a motion for summary judgment, the court does not weigh the evidence to

determine the truth of the matter asserted but simply determines whether a genuine issue for trial

exists, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 106

S. Ct. 2505, 2510 (1986).  The Banks bear the burden of proving that, based upon the record

presented to the court, there is no genuine dispute concerning any material fact and the Debtor's

claims are factually unsupported, entitling the Banks to judgment as a matter of law.  *Celotex Corp.*

*v. Catrett*, 106 S. Ct. 2548, 2553 (1986); *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484,

491 (6th Cir. 2001).  The burden then shifts to the Debtor, the nonmoving party, to prove that there

are genuine disputes of material fact for trial, although reliance solely on allegations or denials

7

contained in the pleadings or "mere scintilla of evidence in support of the nonmoving party will not be sufficient." *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986).

The facts and all resulting inferences are viewed in a light most favorable to the non-movant, with the court deciding whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 106 S. Ct. at 2512.  Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 106 S. Ct. at 1356 (citations omitted).  Based upon the record, the court finds that there is no genuine dispute as to any material fact and that Pinnacle National Bank, Mountain National Bank, and FirstBank are entitled to a  judgment as a matter of law that 11 U.S.C. § 1129(b)(2)(B)(ii) continues to apply to individual Chapter 11 debtors.  Accordingly, because the Debtor is to retain pre-petition property and does not propose to pay unsecured creditors in full, the Amended Plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii) and cannot be confirmed.

### III

If all of the requirements of 11 U.S.C. § 1129(a) other than paragraph (8) are met, the court will confirm a plan that "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, or has not accepted, the plan."  11 U.S.C. § 1129(b)(1) (2006).  In accordance therewith, § 1129(b)(2)(B)(ii), commonly referred to as the "absolute priority rule," provides, in material part:

> (2) For the purposes of this subsection, the condition that a plan be fair and equitable
> with respect to a class includes the following requirements:

. . .

(B) With respect to a class of unsecured claims—

. . .

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14)[5] of this section.

11 U.S.C. § 1129(b)(2)(B)(ii).  In other words, a plan "may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent."  *In re DBSD North Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011).  The absolute priority rule is a limitation created due to "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners."  *Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 119 S. Ct. 1411, 1417 (1999).

With the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), § 1129(b)(2)(B)(ii) was amended to include the phrase "except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section

---

[5] (a) The court shall confirm a plan only if all of the following requirements are met:

. . .

(14) If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

11 U.S.C. § 1129(a)(14) (2006).

1115, subject to the requirements of subsection (a)(14) of this section."   11 U.S.C.

§ 1129(b)(2)(B)(ii) thus incorporated within its terms the newly enacted § 1115, which provides:

> (a) In a case in which the debtor is an individual, property of the estate includes, in
> addition to the property specified in section 541—
>
>> (1) all property of the kind specified in section 541 that the debtor acquires
>> after the commencement of the case but before the case is closed, dismissed,
>> or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
>>
>> (2) earnings from services performed by the debtor after the commencement
>> of the case but before the case is closed, dismissed, or converted to a case
>> under chapter 7, 12, or 13, whichever occurs first.
>
> (b) Except as provided in section 1104 or a confirmed plan or order confirming a
> plan, the debtor shall remain in possession of all property of the estate.

11 U.S.C. § 1115 (2006).   The foregoing amendments have created conflict in the courts as to

whether the absolute priority rule remains in effect for individual Chapter 11 debtors.

The starting point for interpreting any statute is its plain language, and where the statutory

language "is plain, 'the sole function of the courts is to enforce it according to its terms.'"   *United

States v. Ron Pair Enters., Inc.*, 109 S. Ct. 1026, 1030 (1989) (quoting *Caminetti v. United States*,

37 S. Ct. 192, 194 (1917)).   "[C]ourts must presume that a legislature says in a statute what it means

and means in a statute what it says there.   When the words of a statute are unambiguous, then, this

first canon is also the last: 'judicial inquiry is complete.'"   *Conn. Nat'l Bank v. Germain*, 112 S. Ct.

1146, 1149 (1992) (quoting *Rubin v. United States*, 101 S. Ct. 698, 701 (1981)).   Courts are to

scrutinize the statute as a whole and "not look merely to a particular clause in which general words

may be used, but . . . in connection with it the whole statute . . . and the objects and policy of the law,

as indicated by its various provisions, and give to it such a construction as will carry into execution

the will of the Legislature."   *Azarte v. Ashcroft*, 394 F.3d 1278, 1288 (9th Cir. 2005) (quoting

*Kokoszka v. Belford*, 94 S. Ct. 2431, 2436 (1974) (citation omitted)).  "[A]s long as the statutory

scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain

language of the statute." *Ron Pair Enters., Inc.*, 109 S. Ct. at 1030.  Courts may resort to a review

of congressional intent or legislative history only when the plain language of the statute is unclear,

*Hoffman v. Comshare, Inc. (In re Comshare, Inc. Sec. Litig.)*, 183 F.3d 542, 549 (6th Cir. 1999), and

"[a]bsent a clearly expressed legislative intention to the contrary, that language must be ordinarily

regarded as conclusive."  *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 100 S. Ct. 2051,

2056 (1980).

Likewise, it is "[a] fundamental canon of statutory construction . . . that, unless otherwise

defined, words will be interpreted as taking their ordinary, contemporary, common meaning."

*Perrin v. United States*, 100 S. Ct. 311, 314 (1979).  Nevertheless, courts should not "be caught in

the trap of language which seems, literally, too broad or too narrow to accommodate the patent

legislative purposes[,]" *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)

(quoting *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974)), and "should look beyond the

language of the statute only when the text is ambiguous or when, although the statute is facially

clear, a literal interpretation would lead to internal inconsistencies, an absurd result, or an

interpretation inconsistent with the intent of Congress." *Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir.

1999).

In the immediate aftermath of BAPCPA, several commentators agreed that the absolute

priority rule was no longer in effect as to individual Chapter 11 debtors and, following in that stead,

a number of courts also came to the conclusion that "§1115 embraces all property interests of the

debtor, whether acquired before or after the chapter 11 filing, and since § 1129(b)(2)(B)(ii) allows

11

a debtor to keep property 'included in the estate' by § 1115, an individual debtor may retain all of his or her property, subject only to the liquidation test and the disposable income test." *In re Maharaj*, 449 B.R. 484, 492 (Bankr. E.D. Va. 2011) (restating the theory in the context of the court's analysis).  In the first of these cases, *In re Tegeder*, the court found the language of the statute unambiguous, holding that "[s]ince § 1115 broadly defines property of the estate to include property specified in § 541, as well as property acquired post-petition and earnings from services performed post-petition, the absolute priority rule no longer applies to individual debtors who retain property of the estate under § 1115." *In re Tegeder*, 369 B.R. 477, 480 (Bankr. D. Neb. 2007).  In making its determination, the court acknowledged the absence of reported decisions and instead relied upon treatises and commentators, agreeing that "[t]he absolute priority requirements imposed by section 1129(b)(2)(B)(ii) were waived by permitting a debtor to retain property included in the estate under section 1115." *Tegeder*, 369 B.R. at 480 (quoting William L. Norton, Jr., 4 NORTON BANKRUPTCY LAW & PRACTICE 2d § 84A:1; citing W. Homer Drake, Jr., BANKRUPTCY PRACTICE FOR THE GENERAL PRACTITIONER § 12:27 n.28; Rosemary E. Williams, 3 BANKRUPTCY PRACTICE HANDBOOK § 14:152 n.1).

Following on the heels of *Tegeder* was *In re Roedemeier*, in which the court likewise, in reliance upon the treatises and commentators, noted that the following changes were made to Chapter 11 using Chapter 13 as a model so that individual Chapter 11 cases would function more similarly to Chapter 13 cases:

  1.  § 1115 brings property the debtor acquires post-petition into the estate;

  2.  § 1123(a)(8) calls for the debtor's plan to provide for payment to creditors from the debtor's post-petition earnings from services or other future income;

12

3. the exception in § 1129(b)(2)(B)(ii) allows the debtor to keep property included in the estate under § 1115 without paying in full a class of unsecured that rejected his or her plan;

4. § 1129(a)(15) authorizes the debtor to overcome an objection to the plan made by a single unsecured creditor by proposing to distribute under the plan property worth at least as much as the debtor's projected disposable income for a five-year period;

5. § 1141(d)(5) ordinarily delays the entry of the debtor's discharge until completion of all payments under the plan; and

6. § 1127(e) permits modification of a confirmed plan even after substantial consummation for certain purposes.

*In re Roedemeier*, 374 B.R. 264, 275-76 (Bankr. D. Kan. 2007).  Taking them together, the court held that "these changes indicate Congress intended to extend the exemption from the absolute priority rule to individual Chapter 11 debtors as well [as Chapter 13 debtors,]" surmising that "[i]f a class of unsecured creditors who are not to be paid in full under an individual Chapter 11 debtor's plan can bar the debtor from keeping any prepetition property . . . by rejecting the plan and invoking the absolute priority rule . . . then it is difficult to see what purpose these other, related amendments can serve." *Roedemeier*, 374 B.R. at 276.  These changes were also acknowledged by the court in *In re Johnson*, which stated that the similarities between Chapter 13 and individual Chapter 11 cases "have led one commentator to suggest that 'individual Chapter 11 cases can now be characterized as "big Chapter 13" cases . . .'"  *In re Johnson*, 402 B.R. 851, 852-53 (Bankr. N.D. Ind. 2009) (quoting Robert J. Landry, III, *Individual Chapter 11 Reorganizations: Big Problems with the New "Big" Chapter 13*, 29 U. ARK. LITTLE ROCK L. REV. 251, 252 (2006-07)).

Thereafter, in order to answer the query as to how extensively BAPCPA modified § 1129(b)(2)(B)(ii) by the reference to and addition of § 1115, the court in *In re Shat* delved into the legislative history to provide a comprehensive overview of the absolute priority rule and analysis of

13

the changes made by BAPCPA to the rule.  *In re Shat*, 424 B.R. 854, 859-865 (Bankr. D. Nev.

2010).  The court began its discussion with the National Bankruptcy Review Commission's report

in 1997, which sought to change the eligibility requirements for Chapter 7 debtors to include the

means test but did not propose any changes to Chapter 11, before moving to the 1999 Senate

bankruptcy reform bill, which added an amendment to § 541(a)(6) to include post-petition earnings

within a Chapter 11 debtor's estate.  *Shat*, 424 B.R. at 859-60 (citing, among others, S. 625, 106th

Cong., § 321 (as reported by S. Comm. on the Judiciary, May 11, 1999); S. REP. NO. 106-49, at 33

(1999)).  Although the companion House bill did not originally contain any provisions related to

individual Chapter 11 debtors, H.R. 333 was amended to include the amendment to § 541(a)(6), the

language within § 1129(b)(2)(B)(ii) incorporating therein § 1115, an amendment to § 1123 requiring

use of post-petition income to implement a plan, a "projected disposable income" test within

§ 1129(a), an amendment to delay discharge until completion of plan payments, and an amendment

concerning modification.  *Shat*, 424 B.R. at 860-61 (footnotes omitted) (quoting H.R. 833, 106th

Cong. § 321 (engrossed amendment as agreed to by Senate, Feb. 2, 2000); citing, among others, H.R.

833, 106th Cong. (as received in the Senate, May 12, 1999)).

Following a pocket-veto in 2000, re-introduction in 2001, and a House and Senate conference

in 2002, a conference report was issued containing a word-for-word description of the expanded

amendments related to chapter 11 individuals derived from the House Report which is "somewhat

extensive [but] is purely descriptive."  *Shat*, 424 B.R. at 861.  Each successive version of the bill,

none of which altered § 321 of the House bill, was equally silent concerning "the policy behind, or

purposes of, these changes[,]" and BAPCPA was enacted with the following changes to Chapter 11,

14

creating "a sort of hybrid chapter 13, in which many of the provisions of chapter 13 sit uneasily in

chapter 11":

> • redefining property of the estate in chapter 11 under Section 1115 along the lines
> of property of the estate under Section 1306;
>
> • changing the mandatory contents of a plan pursuant to Section 1123(a)(8) to
> resemble Section 1322(a)(1);
>
> • adding the disposable income test of Section 1325(b) to Section 1129(a)(15);
>
> • delaying the discharge until the completion of all plan payments as in Section
> 1328(a);
>
> • permitting a discharge for cause before all payments are completed pursuant to
> Section 1141(d)(5), similar to the hardship discharge of Section 1328(b); and
>
> • the addition of Section 1127(e) to permit the modification of a plan even after
> substantial consummation for purposes similar to Section 1329(a).

*Shat*, 424 B.R. at 862 (citing 5 Keith M. Lundin, CHAPTER 13 BANKRUPTCY § 368.1, at 368-1 to

368-5 (3d ed. 2000 & Supp. 2006)).

Moving on to the post-BAPCPA Bankruptcy Code, the *Shat* court stated that property of the

estate for individual chapter 11 debtors is defined by a two-step process in which "section 1115

creates a baseline estate of all property covered by section 541.  It then adds to that one class of

property excluded for other chapter 11's by section 541(a)(6):  postpetition income from services."

*Shat*, 424 B.R. at 863.  The court then, however, determined that the language of § 1129(b)(2)(B)(ii)

allowing individual Chapter 11 debtors to retain "property included in the estate under section 1115"

to be ambiguous, acknowledging that a narrow reading of "included" would apply only to post-

petition income and not property originally specified in § 541, while under the broader view, § 1115

would entirely supplant § 541 for individual Chapter 11 debtors. *Shat*, 424 B.R. at 863.  Finding that

the narrow view was "underscored by other changes made at the same time" as those made to

15

§ 1129(b)(2)(B)(ii) that seemed to bring an individual Chapter 11 more in line with a Chapter 13

case, including § 1129(a)(15) requiring a debtor, upon the rejection of the plan by an unsecured

creditor, "to commit value equal to five-years' worth of earnings to the plan – earnings that are

property of the estate under Section 1115[,]" the court concluded that "[a] debtor can't really be said

to 'retain' property or income that the Code requires to be committed to plan payments.  Thus, if

section 1129(b)(2)(B)(ii) is read narrowly, it only covers the debtor's income starting five years after

confirmation."  *Shat*, 424 B.R. at 863-64.  The court agreed that doing so would leave individual

Chapter 11 debtors with "' two widely different results:  miserly post-fifth-year income on one side,

and generous designation of all estate property on the other.'"  *Shat*, 424 B.R. at 864 (quoting Bruce

A. Markell, *The Sub-Rosa Subchapter:  Individual Debtors in Chapter 11 after BAPCPA*, 2007 U.

Ill. L. Rev. 67, 90 (2007)).

   After its analysis of the canons of statutory interpretation and the cases having already

decided the issue, the *Shat* court recognized that the broad view was not without problems in that

it "essentially reads the absolute priority rule out of individual chapter 11 cases but does so in a

convoluted manner – arguably indicative that Congress did not fully appreciate the effect of the

language it chose [which] is especially true given that the addition of provisions requiring provision

of the value of future labor effectively overruled *Norwest Bank Worthington v. Ahlers*[, 485 U.S. 197

(1988)] without any mention of that case in the legislative history."  *Shat*, 424 B.R. at 867 (footnotes

omitted).  Nevertheless, the court found the counter-arguments to be "powerful" and adopted the

broad view, thus rejecting the narrow view for the following reasons:

> Chapter 13 has no absolute priority rule, and as noted above, most of the changes
> effected by BAPCPA to individual chapter 11 debtors were part of an overall design
> of adapting various chapter 13 provisions to fit in chapter 11.  The broader view also
> saves Section 1129(b)(2)(B)(ii) from an almost trivial reading; if the narrow view is

16

taken, the section protects only the value of aggregate postpetition earnings payable after the fifth anniversary of plan confirmation.  This interpretation is thus consistent with the Ninth Circuit'' requirement that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. . . . Our goal in interpreting a statute is to understand the statute 'as a symmetrical and coherent regulatory scheme' and to 'fit, if possible, all parts into a . . . harmonious whole.'" *Am. Bankers Ass'n v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).  As the Court said in a nonbankruptcy context, "statutory language cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).

*Shat*, 424 B.R. at 867-68 (footnotes omitted).

In short, the broad interpretation set forth in *Tegeder, Roedemeier*, *Johnson*, and *Shat* can be summarized as follows:

Given the relatively straightforward reading of the statute supporting the broader reading, and the general rehabilitative aim of chapter 11, the court understands the phrase "in addition to the property specified in section 541" to mean that Section 1115 absorbs and then supersedes Section 541 for individual chapter 11 cases.  This construction, in turn, leads to the position that Section 1129(b)(2)(B)(ii)'s exception extends to all property of the estate, including such things as prepetition ownership interest of nonexempt property.  This conclusion is supported by the revisions in 2005 to bring individual chapter 11's more in line with chapter 13.  It is also supported by the few cases to examine the topic.

*Shat*, 424 B.R. at 865 (footnote omitted); *see also Johnson*, 402 B.R. at 852-53 ("An individual debtor's plan does not need to satisfy the absolute priority rule, and, even though unsecured creditors will not be paid in full, can be confirmed over their objection so long as the plan satisfies the disposable income test of § 1325(b)(2)."); Kit James Gardner, *The Absolute Priority Rule in Individual Chapter 11 Cases*, 30 CAL. BANKR. J No. 3 at 311 (2010) ("The absolute priority rule appears to have been totally eliminated in individual Chapter 11 cases by BAPCPA's amendment to section 1129(b)(2)(B), and the addition of section 1115.").

17

On the other side, with what is now the majority opinion, a number of courts follow the narrow interpretation by reading "§ 1129(b)(2)(B)(ii) as referring only to the additional property brought into the estate by § 1115, not property that would already be property of the estate under § 541." *Maharaj*, 449 B.R. at 492.  The first of these cases, *In re Gbadebo*, declined to follow the lead of the treatises and the courts which had adopted the broad view and instead found the language of the statute to be unambiguous, reading "the phrase 'included in the estate under section 1115' to be reasonably susceptible to only one meaning:  i.e., added to the bankruptcy estate by § 1115."  *In re Gbadebo*, 431 B.R. 222, 229 (Bankr. N.D. Cal. 2010).  In support of this reading, the court pointed out that § 541, which states that an estate is created upon the filing of a petition, applies in chapter 11 cases pursuant to 11 U.S.C. § 103(a) (2006) and determined that "[i]f the clause referring to § 541 had not been included in § 1115 and if § 1115 had merely stated that an individual chapter 11 debtor's estate included post-petition property, the argument could have been made that an individual chapter 11 debtor's estate did not include his pre-petition property."  *Gbadebo*, 431 B.R. at 229.

In rejecting the broad interpretation, the court disagreed with *Shat*, concluding that the fact BAPCPA amended the Bankruptcy Code to make Chapter 11 more like Chapter 13 was not "persuasive evidence that Congress intended to eliminate the 'absolute priority' rule" for individual Chapter 11 debtors."  *Gbadebo*, 431 B.R. at 229.  Stating that "[n]o one who reads BAPCPA as a whole can reasonably conclude that it was designed to enhance the individual debtor's 'fresh start[,]'" the court found that "[e]ach one of these new provisions appears designed to impose greater burdens on individual chapter 11 debtor's rights so as to ensure a greater payout to creditors [which] was a frequently expressed overall purpose of BAPCPA:  i.e., to ensure that debtors who can pay

18

back a portion of their debts do so." *Gbadebo*, 431 B.R. at 229 (citing H.R. REP. NO. 109-31, pt. 1, at 2 (2005)). Accordingly, the court made the following determination:

> [I]f §§ 1129(b)(2)(B)(ii) and 1115 are read to eliminate the "absolute priority" rule for individual chapter 11 debtors, the Court is faced with a procedural anomaly. If the plan proposes to pay them anything, the debtor is required to send them a ballot. Yet, their vote can be ignored. This makes no sense. The Court reads §§ 1129(b)(2)(B)(ii) and 1115 to eliminate the "absolute priority" rule only as to an individual chapter 11 debtor's post-petition property. It bases this conclusion on both the language of the statute, both in isolation and viewed in the context of the Bankruptcy Code as a whole. It finds this reading most consistent with the intent of Congress as expressed in the legislative history.

*Gbadebo*, 431 B.R. at 230. *See also In re Steedley*, 2010 WL 3528599, at *2 (Bankr. S.D. Ga. Aug. 27, 2010) ("The plain language of the relevant provisions is unambiguous. . . . Nothing in the plain language of § 1115 suggests that it subsumes § 541.").

Following *Gbadebo*, courts addressing this issue since have uniformly adopted the narrow interpretation. Although the court in *In re Gelin* recognized that the broad view was "certainly a plausible interpretation given the text's unquestionable ambiguity," it nevertheless found the arguments in favor of the narrow interpretation to be "more persuasive." *In re Gelin*, 437 B.R. 435, 441 (Bankr. M.D. Fla. 2010). Agreeing with the analysis in *Gbadebo* and disagreeing with that in *Shat*, the court deduced that since neither § 103(a) nor § 541 was amended by BAPCPA, "there is no reason for § 1115 to 'absorb' or 'supersede' § 541 to define property of the estate for individual Chapter 11 cases" since addition of a provision was all that was necessary in order to add property to the estate, which was "most likely what the drafters meant by the phrase 'in addition to property specified in section 541' in § 1115." *Gelin*, 437 B.R. at 442. Stating that it could "hardly imagine a more convoluted way of eliminating the absolute priority rule" than that proposed by the courts adopting the broad view, the court determined the broad view was "an incredibly complicated and

forced interpretation of these sections, especially given the dearth of on-point legislative history" and held that "[i]f Congress truly meant to exempt an individual debtor's entire estate, it likely would have referred to *both* §§ 541 and 1115 [in § 1129(b)(2)(B)(ii)]." *Gelin*, 437 B.R. at 442.

Similarly, in *In re Mullins*, the court agreed with *Gbadebo*'s determination that the statute was not ambiguous, stating that the courts adopting the broad view "have strained to find ambiguity in the statute in order to arrive at a construction which is more in keeping with the broader intent of certain BAPCPA provisions intended to make individual chapter 11 cases more similar to chapter 13 cases, which are not subject to the absolute priority rule." *In re Mullins*, 435 B.R. 352, 360 (Bankr. W.D. Va. 2010).  Focusing on the *Roedemeier* case, the court surmised the following:

> The *Roedemeier* case, as does the present case before this Court, involved a dentist who provided professional services [through] a professional corporation which he had established and owned prior to filing bankruptcy.  Accordingly, the Kansas court quite reasonably observed that it wouldn't make much practical sense to exclude the post-petition earnings of the debtor from the operation of the absolute priority rule, but not the professional corporation which served as the vehicle for the operation of the dental practice which generated such income.  While this Court agrees that such a result does seen anomalous, it does appear to be the result which follows in these particular circumstances from the language found in the statute.  This "real world" difficulty of applying the statute appears to be an unintended consequence of that language in situations very probably not contemplated by Congress when the language contained in the statute was chosen.  To follow the rule adopted by the majority of prior decisions addressing this issue, however, would be to ignore an obvious reality, which is that if it had been the intent of Congress to eliminate entirely the operation of the absolute priority rule from individual chapter 11 cases, it would have been much clearer, easier and more direct for it to have said simply in § 1129(b)(2)(B)(ii) "except that in a case in which the debtor is an individual, this provision shall not apply" in lieu of the language which it did use, "except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115...."  The result reached by Judge Tchaikovsky and now by this Court maintains the absolute priority rule in individual chapter 11 cases with respect to property already owned by the debtor at the time of filing, i.e., property included in the bankruptcy estate under the authority of 11 U.S.C. § 541, but not as to the property brought into the estate by § 1115, i.e., post-petition earnings and other property acquired post-petition.

*Mullins*, 435 B.R. at 360 -361.  Also following the narrow interpretation, the *Stephens* court held that "[t]he language 'in addition to the property specified in section 541' in the preamble to section 1115(a) would render surplusage the words 'all property of the kind specified in section 541' in section 1115(a)(1), if section 1115 is interpreted to include all property of the estate."  *In re Stephens*, 445 B.R. 816, 820-21 (Bankr. S.D. Tex. 2011).

The court in *In re Karlovich* also found the language of the statute to be unambiguous, stating that "[t]he effect of the new provision in § 1129(b)(2)(B)(ii) is not to abrogate the absolute priority rule, but to make it the same for individual and non-individual Chapter 11 debtors, as it was prior to BAPCPA . . . [whereas] property of the estate did not include post-petition acquired property and earnings for individuals and non-individuals alike."  *In re Karlovich*, ___ B.R. ___, 2010 WL 5418872, at *3-4 (Bankr. S.D. Cal. Nov. 16, 2010).  The court stated that had Congress intended to abrogate the absolute priority rule for individuals, it "could easily have added 'except with respect to individuals' at the beginning of § 1129(b)(2)(B)(ii), or stated that an individual could retain all property."  *Karlovich*, 2010 WL 5418872, at *4.  Further, in response to the determination by those courts adopting the broad view that Congress intended to make individual Chapter 11 cases more like Chapter 13 cases, the court held that

> Some of the courts which viewed the BAPCPA amendments as an abrogation of the absolute priority rule in individual Chapter 11 cases did so because they thought Congress was intending to make individual Chapter 11 cases more like Chapter 13 cases, where there is no absolute priority rule.  What those courts overlook is that if that were Congress' intent, Congress would simply have amended the statutory debt ceilings for Chapter 13 cases set out in 11 U.S.C. § 109(e), and either eliminate them altogether or set them much higher.  Congress did no such thing, instead clearly intending that Chapter 11 statutory provisions would continue to apply to individual Chapter 11 cases while recognizing that post-petition earnings of individual Chapter 11 debtors should be available under § 1129(b)(2)(B), and protected, as it is in Chapter 13 cases under 11 U.S.C. § 1306.

21

*Karlovich*, 2010 WL 5418872, at *4.  Similarly, the court in *In re Walsh* distinguished the broad

view and held that "Section 1115 deals with something more than post-petition income from services

[as focused on in *Shat*] – it also brings in property described in section 541 but which is acquired

post-petition.  . . . [B]ecause it deals with post-petition section 541(a) property (a most awkward

construction), Section 1115 does *not* include section 541(a) property as such." *In re Walsh*, 447 B.R.

45 (Bankr. D. Mass. 2011) (emphasis in original).  Likewise, as stated succinctly by the court in *In

re Draiman*,

> Congress did not explicitly eliminate the absolute priority rule for individual Chapter
> 11 debtors.  The cases that have held that the absolute priority rule has been
> eliminated have done so because they found § 1115 absorbs § 541, representing the
> entire definition of the bankruptcy estate.
>
> Section 1115 explains that certain post-petition property and earnings are
> "include[d]" in the bankruptcy estate in addition to the property set forth in § 541.
> This Court's reading of § 1115 is that it *adds* property to the debtor's estate which
> has already been established by § 541.  Thus, § 1115 consists only of the property set
> forth in subsections (1) and (2) of § 1115.

*In re Draiman*, ___ B.R. ___, 2011 WL 1486128, at *37 (Bankr. N.D. Ill. Apr. 19, 2011).

Agreeing that the narrow view was the correct interpretation but finding that the language

of both §§ 1129(b)(2)(B)(ii) and 1115 to be ambiguous, the court in *In re Kamell* also found that the

legislative history for both was "scarce, equivocal and altogether unhelpful," and it was "left unaided

by any general precepts of statutory interpretation in making some sense of ambiguous language,"

posing the issue as:

> Does "included in" as used at § 1129(b)(2)(B)(ii) mean the equivalent of "added to"
> through § 1115, since property of the estate has long been defined under § 541?  This
> interpretation would be somewhat consistent with the language of § 1115 itself which
> begins with an introductory reference of "*in addition to* the property specified at
> section 541 ..." (italics added).  Or does this language "included in" mean something
> closer to "referenced" which the *Shat* court thought meant § 541 was merely
> "absorbed" and "superseded" into § 1115 for individual 11's?

*In re Kamell*, ___ B.R. ___, 2011 WL 1760282, at *3 (Bankr. C.D. Cal. May 4, 2011) (citation omitted).  Stating that it was "not persuaded by this vague language that Congress meant to abrogate the absolute priority rule out of individual chapter 11s entirely[,]" the court held that "major changes to existing practice will not be inferred unless clearly mandated[,]" and when a new law is enacted, "'[it] normally can be presumed [that Congress] had knowledge of the interpretation given to the [old] law.'"  *Kamell*, 2011 WL 1760282, at *3 (quoting *Ahlers*, 485 U.S. at 211).

With respect to the *Ahlers* decision, in which the Supreme Court upheld application of the absolute priority rule and held that contributions of new value must be "money or money's worth[,]" the court concluded that

> From such awkward and convoluted language the court cannot infer that Congress truly intended such a wide and important change to individual Chapter 11 practice as discarding the absolute priority rule.  This is particularly so since the whole "sweat equity" theory of "new value" was so carefully discussed by the Supreme Court in *Norwest Bank Worthington v. Ahlers*, which held that contributions of new value must be "money or money's worth."  Presumably, post-petition earnings contributed to a plan indeed constitute "money or money's worth," and are not mere "sweat equity," as indeed now these kinds of property are part of the estate.  In this the court both agrees and disagrees with the *Shat* court, which noted the "broad view" effectively overrules *Norwest Bank Worthington v. Ahlers* in individual cases.  The court agrees that such a momentous change should have at least merited a mention in the legislative history.  But the court infers from this omission the opposite conclusion, i.e. that there was no intent to abrogate the absolute priority rule by including into the estate future earnings since this inclusion does not address existing property one way or the other.  So it is easier for the court to view the BAPCPA amendments as complimentary to the existing jurisprudence surrounding the "absolute priority rule."  Indeed, as discussed below, the careful distinction in the BAPCPA amendments between that portion of post petition earnings which must be devoted to a plan in the event of objection of a single creditor under § 1129(a)(15), and the entirety of the post petition earnings and acquisitions until the case is closed, dismissed or converted which are now defined as property of the estate in § 1115(a), suggests to the court that the drafters intended to keep the absolute priority rule as pertains to pre-petition assets as a further barrier to cram down under § 1129(b)(2)(B).

*Kamell*, 2011 WL 1760282, at *3 (citations omitted).  The court then continued its analysis by disagreeing with the broad view's reliance upon BAPCPA's attempts to make individual Chapter 11s more like Chapter 13s, stating, as did other courts following the narrow view, that if the intent had been to make all larger individual reorganizations alike, Congress could have simply raised the § 109(e) debt limitations, and expounding that "[j]ust because Chapter 13 does not have the absolute priority rule is not alone sufficient to justify the rather tortured reading of §§ 1129(b)(2)(B)(ii) and 1115 engaged in by the 'broad view' courts. . . . Clearly, Congress instead intended that the separate requirements of disclosure, voting, determination by percentages of 'consenting' impaired classes and other protections unique to Chapter 11 continue to have some application in larger individual reorganization cases." *Kamell*, 2011 WL 1760282, at *4.

The court then summarized its explanation of how the statutes were supposed to "work in tandem" as follows:

> The court finds it at least equally plausible that Congress merely intended to make individual and non-individual Chapter 11 debtors more alike by including in the estate of an individual under § 1115 post-petition property and earnings, but at the same time avoiding through § 1129(b)(2)(B)(ii) the untenable situation that an individual cannot keep any of his post-petition earnings for the entire period of his plan nor any pre-petition property if he must resort to cram down.  There is clearly a distinction after BAPCPA between what an individual chapter 11 debtor facing objection may devote in post-petition property and earnings, and what post-petition property he must devote to the plan.  Section 1115 provides that all post petition earnings and acquisitions until the case is closed, converted or dismissed are property of the estate.  The debtor facing objection of a single creditor must in any case devote at least a value equivalent to what he earns as "projected disposable income" in the 5–year period beginning with the first payment under 11 U.S.C. § 1129(a)(15)(B), or for any longer term of the plan.  But without some amelioration in § 1129(b)(2)(B)(ii), there would be, in effect, an oppressive and lengthy servitude imposed upon the individual Chapter 11 debtor for the entire period of the plan as a price for achieving any cram down.  Unlike Chapter 13, a Chapter 11 plan might last for many years more than the 5–yr maximum since there is no Chapter 11 analog to § 1325(b)(4).  Further, the minimum contribution required in § 1129(a)(15)(B) is carefully expressed in terms of "projected disposable income," which necessarily

24

implies deduction of certain living expenses as described in § 707(b)(2)(A).  In contrast, the property included in the estate under § 1115 includes all post petition earnings, not limited by deduction for monthly expenses. So, if the "absolute priority rule" persisted after BAPCPA it would have prevented the debtor from keeping any of his post-petition earnings as the price for cram down; thus enters the necessary amelioration in § 1129(b)(2)(B)(ii). Obviously, forfeiting all post-petition income would have been at least difficult if not impossible in almost all individual cases. So, the "absolute priority rule" had to be amended to let the debtor keep enough of his post petition earnings to sustain his livelihood. But this is as far as one needs to go to make sense of the new statutory scheme. There is simply no reason to include the further subject of existing, pre-petition property.

The court sees instead a Congressional effort to balance benefits and hardships in cram down for Chapter 11 individuals. After BAPCPA, the debtor facing opposition of any one unsecured creditor must devote 5 years worth of "projected disposable income," at a minimum (or longer if the plan is longer). But debtor is not compelled to give also his additional earnings or after-acquired property net of living expenses beyond five years unless the plan is proposed for a period longer than five years. But there is no compelling reason to also conclude that prepetition property need not be pledged under the plan as the price for cram down, just as it has always been. This does unnecessary violence to well-established jurisprudence. Cram-down is not necessary to deal with a single unsecured creditor's objection which is already addressed at § 1129(a)(15). Cram-down is only triggered where an entire class of unsecured creditors have dissented from the plan. Therefore, it is logical to assume that Congress understood that, in cram-down, the stakes should be a notch higher, i.e. no pre-petition assets and only a portion of post-petition assets can be kept under § 1129(b)(2)(B)(ii). This "narrow view" better explains the peculiar wording of § 1115 and the reference of "included in" found at § 1129(b)(2)(B)(ii). In overall effect, application of the absolute priority rule is the same both before and after BAPCPA. Moreover, the careful reference in § 1129(b)(2)(B)(ii) to only § 1115 and not to § 541 preserves the distinction between existing assets and those acquired post-petition because of the way § 1115 is worded (which clearly makes post-petition earnings and acquisitions an addition to § 541 property). Had the "broad view" been correct it would have been far more logical to simply reference "property of the estate" generally or, better yet, to simply make application of § 1129(b)(2)(B) inapplicable in individual cases.

*Kamell*, 2011 WL 1760282, at *4-5 (citations omitted).

Finally, following directly on the heels of *Kamell* was *In re Maharaj*, in which the court

likewise adopted the narrow view that "the absolute priority rule continues to exist in individual

chapter 11 cases with respect to non-exempt property that was owned by the debtor on the filing date

25

of the petition." *Maharaj*, 449 B.R. at 493.  Citing to the previously discussed cases adopting both

views, the court concluded that "upon careful consideration, this court finds the interpretation placed

on § 1129(b)(2)(B)(ii) by *Mullins* and the other opinions reaching the same conclusion to be more

consistent with the structure of the changes made by BAPCPA."  *Maharaj*, 449 B.R. at 493.  The

court also sympathized with the debtors' inability to fund a more lucrative plan for unsecured

creditors but noted that "a fundamental feature of chapter 11 is the right of creditors to vote on a plan

that impairs their claims, and confirmation can be achieved over their rejection of the plan only in

limited circumstances."  *Maharaj*, 449 B.R. at 494.

Having fully considered the analyses in support of the differing views and based upon the

wording of the both § 1129(b)(2)(B)(ii) and § 1115, the court agrees with the reasoning of those

courts ascribing to the more narrow view – that the absolute priority rule continues to apply in

individual chapter 11 cases.  Starting with the canons of statutory interpretation, it is axiomatic that

the language of § 1129(b)(2)(B)(ii) and § 1115 is ambiguous, otherwise there would be no split of

authority and the arguments in favor of each position so diverse.  There is also no dispute that the

legislative history for BAPCPA is sparse, at best, and provides no real assistance in this instance.

Instead, the court agrees that the proper interpretation hinges on what Congress intended by the

phrase "included in the estate under § 1115" added to § 1129(b)(2)(B)(ii).  In order to do so properly,

§ 1115 must first be examined more closely.

After setting forth that it applies only to individuals, the statute directs that property of the

estate "includes, in addition to the property specified in section 541 – (1) all property of the kind

specified in section 541 that the debtor acquires after the commencement of the case . . .; and

(2) earnings from services performed by the debtor after the commencement of the case . . .[.]"

11 U.S.C. § 1115(a).  Clearly, and seemingly not in controversy amongst the courts, § 1115(a) amends § 541 only as to individual Chapter 11 debtors to bring into their bankruptcy estate the previously excluded property acquired by the debtors post-petition and post-petition wages.  *See* 11 U.S.C. § 541(a)(6) (expressly excluding earnings as property of the estate); 11 U.S.C. § 541(a)(7) (including within the estate only post-petition property acquired by the estate).  It does not, however, supplant or take the place of § 541, only supplements it.  Further, by virtue of § 1115(b), individual Chapter 11 debtors are to remain in possession of all property of the estate, subject to the provisions of § 1104 and/or a confirmed plan.

Returning to § 1129(b)(2)(B)(ii), because § 1115 is a supplement to § 541 with respect to individual Chapter 11 debtors, the more logical reading of the phrase "included in the estate under section 1115" is the narrow one – that Congress intended for only post-petition wages and debtors' after-acquired property to be excepted from the absolute priority rule.  As aptly discussed by prior decisions, had the intent been to completely remove application of § 1129(b)(2)(B)(ii) as to individual Chapter 11 debtors, Congress could have done so in a more explicit manner.  For instance, it could simply have added the phrase "except in a case in which the debtor is an individual" to the beginning of subsection (ii) without reference to § 1115 at all.  However, by referencing § 1115, the purpose of which is to add post-petition wages and property acquired by the debtors post-petition into the estate, it can easily be deduced that Congress intended to exclude only post-petition wages and property acquired by the debtors post-petition from application of § 1129(b)(2)(B)(ii).

The court also finds the narrow interpretation more in line with the primary purpose of BAPCPA "'to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors.'"  H.R.

27

Rᴇᴘ. Nᴏ. 109-31, pt. 1, at 2; 2005 WL 832198, at *2; *see also Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 725 (2011); *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 85 (2d Cir. 2010). As stated in the House Report, the following were factors cited in support of bankruptcy reform:

> Representing the most comprehensive set of reforms in more than 25 years, S. 256's consumer bankruptcy provisions respond to several factors. First, the recent escalation of consumer bankruptcy filings does not appear to be just a temporary event, but part of a generally consistent upward trend. In 1998, for example, bankruptcy filings exceeded one million for the first time in our nation's history. Over the past decade, the number of bankruptcy filings has nearly doubled to more than 1.6 million cases filed in fiscal year 2004. As a result, there is a growing perception that bankruptcy relief may be too readily available and is sometimes used as a first resort, rather than a last resort. Despite the view of opponents of bankruptcy reform that abuse in the system is not widespread and that most bankruptcy filings result from causes beyond debtors' control, such as family illness, job loss or disruption, or divorce, the Committee concluded that reforms were nevertheless necessary.

> Second, there are significant losses asserted to be associated with bankruptcy filings. As one witness explained during the Senate Judiciary Committee's hearing on S. 256 earlier this year:

>> Like all other business expenses, when creditors are unable to collect debts because of bankruptcy, some of those losses are inevitably passed on to responsible Americans who live up to their financial obligations. Every phone bill, electric bill, mortgage, furniture purchase, medical bill, and car loan contains an implicit bankruptcy "tax" that the rest of us pay to subsidize those who do not pay their bills. Exactly how much of these bankruptcy losses is passed on from lenders to consumer borrowers is unclear, but economics tells us that at least some of it is. We all pay for bankruptcy abuse in higher down payments, higher interest rates, and higher costs for goods and services.

>> According to some analyses, the increase in consumer bankruptcy filings has adverse financial consequences for our nation's economy. For instance, it was estimated that in 1997 alone more than $44 billion of debt was discharged by debtors who filed for bankruptcy relief, a figure when amortized on a yearly basis amounts to a loss of at least $110 million every day. These losses, according to one estimate, translate into a $400 annual "tax" on every household in our nation. In 2003, the Nilson Report (a credit industry newsletter) announced that issuers of proprietary and general purpose credit cards "lost $18.9 billion in 2002 from consumer bankruptcy filings," an increase of 15.1 percent over the prior year. The Credit Union

National Association (CUNA) reported that credit unions, as of 2002, lost "nearly $3 billion from bankruptcies" since Congress began its consideration of bankruptcy reform legislation in 1998.  CUNA estimates that over 40% of all credit union losses in 2004 will be bankruptcy-related, and those losses will total approximately $900 million.

A third factor motivating comprehensive reform is that the present bankruptcy system has loopholes and incentives that allow and–sometimes–even encourage opportunistic personal filings and abuse.  A civil enforcement initiative undertaken in 2002 by the United States Trustee Program (a component of the Justice Department charged with administrative oversight of bankruptcy cases) has "consistently identified" such problems as "debtor misconduct and abuse, misconduct by attorneys and other professionals, problems associated with bankruptcy petition preparers, and instances where a debtor's discharge should be challenged." According to the United States Trustee Program, "Abuse of the system is more widespread than many would have estimated." Such abuse ultimately hurts consumers as well as creditors.

A fourth factor relates to the fact that some bankruptcy debtors are able to repay a significant portion of their debts, according to several studies.  Current law, however, has no clear mandate requiring these debtors to repay their debts.  Accordingly, "[w]hile there is a universal agreement among the courts that an individual debtor's ability to repay his or her debts from future earnings is, at the very least, a factor in determining whether substantial abuse would occur in a chapter 7 case, there are differences among the courts as to the extent to which they rely on a debtor's ability to repay."

H.R. REP. NO. 109-31, pt. 1, at 3-5; 2005 WL 832198, at *2-3.  When read in conjunction with the

foregoing factors and Congress's stated purpose for enacting BAPCPA, it is not reasonable to think

that Congress would amend § 1129(b)(2)(B)(ii) to abrogate the absolute priority rule in its entirety

as to individual Chapter 11 debtors while at the same time attempting to shift the majority of filings

from liquidation to reorganization and requiring individual debtors to repay more of their debts.  On

the other hand, bringing post-petition wages and property acquired by debtors post-petition into their

estates better serves those purposes by offering trustees and debtors-in-possession additional assets

with which to reorganize.

In summary, the court agrees with those cases adopting the narrow interpretation, finding that § 1115 supplements rather than supplants § 541 with respect to individual Chapter 11 debtors.  The absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B)(ii), therefore, continues to apply to individual Chapter 11 debtors.  The Motions for Summary Judgment will be granted.  Because it provides for the retention of property owned by the Debtor pre-petition but does not propose to pay the dissenting class of unsecured creditors in full, the Amended Plan is not "fair and equitable" as required by § 1129(b).  Confirmation will be denied.

An Order consistent with this Memorandum will be entered.

FILED:  August 5, 2011

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE